IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PELLETRON CORPORATION,** | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| **C.H. ROBINSON WORLDWIDE, INC.,** | : | |
| Defendant/Third-Party Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **P&A TRANSPORTATION, INC.,** | : | No. 11-6944 |
| Defendant/Third-Party Defendant. | : | |

## MEMORANDUM

**Schiller, J.**                                                                                       July 31, 2012

In the early morning hours of June 21, 2011, a shipment of a pneumatic conveying system went missing from the CarbonLITE Industries facilities in Riverside, California. Though the culprit of the missing truck and goods may never be found, the truck and the goods turned up undisturbed on January 19, 2012. Unfortunately, says Plaintiff Pelletron Corporation, the company that sold the pneumatic conveying system to CarbonLITE, the buyer of the goods refused to accept the shipment because it was late. The stolen goods spawned this litigation among Pelletron, C.H. Robinson Worldwide, Inc. ("CHR"), and P&A Transportation ("P&A"). Presently before the Court are the summary judgment motions of CHR and P&A. For the reasons that follow, the Court denies CHR's motion in its entirety and grants in part and denies in part P&A's motion.

I.   **BACKGROUND**[1]

Pelletron is a company based in Lancaster, Pennsylvania, and is in the business of making bulk material handling equipment for use in manufacturing settings. (Second Am. Compl. ¶¶ 1, 10.) In November 2010, Pelletron entered into a contract with CarbonLITE Industries for the design and manufacture of a pneumatic conveying system to be installed in a new recycling plant CarbonLITE was building in Riverside, California. (Pl.'s Statement of Disputed Facts in Opp'n to Mots. for Summ. J. [Pl.'s Facts] ¶ 13.) On June 1, 2011, Pelletron requested from CHR a shipping quote for part of the pneumatic conveying system for the CarbonLITE plant. (*Id.* ¶¶ 16-17.) The email requesting a quote stated that the "Value for Ins. = 100k." (*Id.* ¶ 16.) CHR responded with a shipping quote; the quote failed to indicate that CHR was a transportation broker or that a third party would be transporting Pelletron's goods. (*Id.* ¶¶ 20-21.) Pelletron sought confirmation that "there is coverage for loss up to 100K." (*Id.* ¶ 24.) CHR responded that "[a]ll of our carriers have a minimum of 100K insurance. We would be covered there." (*Id.* ¶ 25.) Pelletron prepared a bill of lading, BOL #103, for the shipment. (*Id.* ¶¶ 27-28.) The bill of lading identified CHR as the "Carrier/Driver." (*Id.* ¶ 29.) On June 2, 2011, a driver scheduled by CHR picked up the goods; the shipment was successfully delivered to the CarbonLITE plant on June 6, 2011. (*Id.* ¶¶ 32, 39, 41.)

On June 15, 2011, Pelletron contacted CHR to arrange for another shipment of goods that were part of the pneumatic conveying system it sold to CarbonLITE. (*Id.* ¶¶ 42, 45.) Based on its prior exchange with CHR, Pelletron believed that the minimum insurance coverage of $100,000

---

[1] Defendants failed to follow this Court's Scheduling Order which laid out the format for how this Court expects summary judgment motions to be briefed. P&A failed to include a clearly labeled statement of undisputed facts, although it at least set forth certain facts in numbered paragraphs to support its argument. CHR only included a fact section in its brief.

remained applicable. (*Id.* ¶ 44.) CHR, pursuant to a contract with P&A, arranged for P&A to transfer the goods to California. (P&A's Mot. for Summ. J. ¶ 7.) Pelletron eventually prepared two bills of lading for the shipment, but prior to their preparation, the computer of the individual responsible for preparing the bills of lading crashed, causing the bill of lading software to be deleted. (Pl.'s Facts ¶¶ 51, 53.) After the program was reinstalled, a computer glitch caused the bills of lading to reflect a $10,000 per load "agreed or declared value of the property." (*Id.* ¶¶ 52-55.) Pelletron never advised CHR that the value of the goods to be shipped was $10,000.00 and never requested a shipping rate from CHR based upon a $10,000.00 value. (*Id.* ¶ 58.) The bills of lading indicated CHR as the "Carrier/Driver" (*Id.* ¶¶ 63, 66.) On June 17, 2011, two drivers scheduled by CHR arrived to pick up the shipments. (*Id.* ¶ 71.) Undre Pierre, a P&A driver, picked up one of the shipments for delivery to CarbonLITE's facility in California. (P&A's Mot. for Summ. J. ¶¶ 8-9.) On the bill of lading signed by Pierre, he wrote "P&A Transportation" under his signature. (Pl.'s Facts. ¶ 75.) On June 21, 2011, a CHR representative informed a sales engineer for Pelletron that the truck driven by Pierre, and the goods inside, had been stolen. (P&A's Mot. for Summ J. ¶¶ 9-10; Pl.'s Facts ¶¶ 83-84, 86, 90, 95-97.) The stolen vehicle was recovered from a warehouse in California on January 19, 2012. (Pl.'s Facts ¶ 106; P&A's Mot. for Summ. J. ¶ 11.) The goods were found in their original shipping crates, undamaged and still palletized and shrink-wrapped. (P&A's Mot. for Summ. J. ¶ 11.)

The shipment to CarbonLITE Industries was time sensitive, and as a result, Pelletron was unable to deliver its product as promised. (Pl.'s Facts ¶ 101.) Pelletron also refused to take back the goods because they were specially made for CarbonLITE Industries, and the machinery had no residual or alternative market value. (*Id.* ¶ 107.) Pelletron submitted claims in the amount of

$308,290.37 to both CHR and P&A for the loss. (*Id.* ¶¶ 98-99.) Pelletron also alleges that it suffered the following consequential damages: (1) $19,200 in costs to reorder the necessary equipment on an expedited basis; (2) $16,000 in personnel costs; (3) $26,082 to re-ship the replacement equipment on an expedited basis; and (4) $20,000 in costs for interruptions and delays in its installation schedule. (Second Am. Compl. ¶ 35; *see also* Pl.'s Facts ¶¶ 102-05.)

Pelletron's Second Amended Complaint brings the following four claims against each Defendant: (1) violation of the Carmack Amendment; (2) breach of contract; (3) breach of bailment obligation; and (4) negligence.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 32 F.3d 768, 777 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*,

530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

### III.   DISCUSSION

#### A.   CHR's Summary Judgment Motion

CHR argues that Pelletron's claim against it under the Carmack Amendment should be dismissed because CHR acted as a broker and brokers are not subject to liability under the Carmack Amendment. In 1906, Congress enacted the Carmack Amendment, with the purpose of "reliev[ing] shippers of the burden of searching out a particular negligent carrier from among the numerous carriers handling an interstate shipment of goods." *Reider v. Thompson*, 339 U.S. 113, 119 (1950). The Carmack Amendment requires carriers to issue a receipt or bill of lading for property received for transportation and holds carriers liable for actual loss or injury to the property resulting from the transportation thereof in claims arising out of the receipt or bill of lading. 49 U.S.C. § 14706(a)(1); *Babcock & Wilcox Co. v. Kansas City S. Ry. Co.*, 557 F.3d 134, 137 (3d Cir. 2009). A carrier is defined as "a motor carrier, a water carrier, and a freight forwarder." 49 U.S.C. § 13102(3). A "motor carrier" is a "person providing commercial motor vehicle transportation for compensation." *Id*. § 13102(14).

Contrasted with a carrier, a broker is not liable under the Carmack Amendment for the value of goods lost in interstate commerce. *Phoenix Assurance Co. v. K-Mart Co.*, 977 F. Supp. 319, 325 (D.N.J. 1997). *see also Hewlett-Packard Co. v. Brother's Trucking Enters., Inc.*, 373 F. Supp. 1349, 1351 (S.D. Fla. 2005) ("The Carmack Amendment governs carriers, not brokers."). A broker is defined as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation,

advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2).

While the Carmack Amendment does not apply to brokers, it does not preempt state law claims against brokers. *Cont'l Cas. v. Quick Enters.*, Civ. A. No. 12-2351, 2012 WL 2522970, at *2 (D.N.J. June 29, 2012) ("The Third Circuit has also not addressed whether the Carmack Amendment preempts state law claims raised against freight brokers. It appears, however, that several other courts have considered the issue and found that the Carmack Amendment does not preempt such claims."); *see also Commercial Union Ins. Co. v. Forward Air, Inc.*, 50 F. Supp. 2d 255, 257 (S.D.N.Y. 1999) ("In short, this case requires the court to decide whether the Carmack Amendment, in omitting reference to the liability of brokers for damage to shipped goods, intended to afford brokers total immunity from such a suit. The Court concludes that the Carmack Amendment does not bar suits against brokers."). Accordingly, if CHR is a carrier, it is subject to liability under the Carmack Amendment. If, however, CHR is a broker, it is not subject to liability under the Carmack Amendment, and Plaintiff must rely on its tort and contract claims against CHR.

Pelletron argues that CHR held itself out as a carrier and thus this Court cannot find as a matter of law that CHR is a broker. Pelletron is correct. "The difference between a carrier and a broker is often blurry." *Neb. Turkey Growers Coop. Ass'n v. ATS Logistics Servs., Inc.*, Civ. A. No. 05-3060, 2005 WL 3118008, at *4 (D. Neb. Nov. 22, 2005). If CHR promised to personally perform the transport and therefore legally bind itself to transport, it should be considered a carrier. *See Buchanan v. Neighbor's Van Lines*, Civ. A. No. 10-6206, 2011 WL 5005769, at *6 (C.D. Cal. Oct. 20, 2011); *see also CGU Int'l Ins., PLC v. Keystone Lines Corp.*, Civ. A. No. 02-3751, 2004 WL 1047982, at *2 (N.D. Cal. May 5, 2004) ("[I]f Keystone accepted responsibility for ensuring delivery

of the goods, regardless of who actually transported them, then Keystone qualifies as a carrier. If however Keystone merely agreed to locate and hire a third party to transport the machines, then it was acting as a broker."). Thus, relevant to determining the status of CHR are the services it offered, as well as whether it held itself out to the public as the actual transporter of goods. *See Delta Research Corp. v. EMS, Inc.*, Civ. A. No. 04-60046, 2005 WL 2090890, at *5-6 (E.D. Mich. Aug. 29, 2005); *see also Nipponkoa Ins. Co. v. C.H. Robinson Worldwide, Inc.*, Civ. A. No. 09-2365, 2011 WL 671747, at *4-5 (S.D.N.Y. Feb. 18, 2011) (noting that when determining if an entity qualifies as a carrier, courts consider whether statements to a shipper indicated that its actions were not limited to arranging transport but also included exerting some measure of control over drivers).

There is evidence in the record that Pelletron reasonably believed that CHR was acting as a carrier because CHR held itself out as one. The bills of lading list CHR as the carrier in two places. While CHR points out that Pelletron prepared the bills of lading, the Court believes that supports Pelletron's contention that it thought CHR was acting as a carrier, not as a broker. Although that belief may have been mistaken, there is no indication that CHR did anything to dispel Pelletron of that notion. The fact that a driver from P&A signed the bill of lading does not foreclose CHR from also acting as a carrier. Furthermore, Pelletron's answers to CHR's interrogatories state that "Plaintiff had no knowledge of P&A Transportation, Inc. until this litigation began." (CHR's Mot. for Summ. J. Ex. D [Pelletron's Answers to CHR's Interrogs.] at 3.) Although the record, including a bill of lading that specifically mentions P&A, calls that categorical statement into question, the Court finds that a genuine issue of material fact exists over the status of CHR.

To support its position, CHR points to a statement from its agent to Pelletron that "all of our carriers have a minimum 100k insurance." (Mem. of Law in Supp. of CHR's Mot. for Summ. J. at

8.) That single statement in no way precludes CHR from acting as a carrier because it offers no indication that its only role was to secure a third party to ship Pelletron's goods. CHR arguably painted itself as one-stop shipping for Pelletron's needs and in so doing could be viewed as personally taking responsibility for transporting the goods. (*See* Pl.'s Facts Ex. C [CHR Mktg. Materials].)

CHR ignores the evidence put forth by Pelletron, including CHR's marketing materials, and instead argues that since it never explicitly stated it was a carrier and it views itself as a broker, as a matter of law, it acted as a broker. The Court is not so quick to dismiss Pelletron's evidence, including the bills of lading identifying CHR as a "Carrier/Driver." This evidence raises a genuine issue of material fact as to whether CHR was acting as carrier here. Furthermore, Pelletron claims to have been unaware of P&A's role in the shipment of its goods until a driver for P&A showed up and signed the bill of lading. A reasonable fact finder could conclude that during negotiations between CHR and Pelletron, CHR held itself out to Pelletron as not only an arranger of transportation, but as a carrier.

"Courts frequently conclude that there are issues of fact as to whether an entity is a carrier for purposes of the Carmack Amendment." *Nipponkoa*, 2011 WL 671747, at *5 (collecting cases). Indeed, in *Nipponkoa*, the court refused to hold as a matter of law that CHR was a broker and thus not subject to liability under the Carmack Amendment. *Id*. at *5-8. As the status of CHR remains an open question, the Court will also deny CHR's motion for summary judgment on its state law claims. If CHR is ultimately deemed to be a carrier, these claims may be preempted. *See REI Transp. v. C.H. Robinson Worldwide, Inc.*, 519 F.3d 693, 697 (7th Cir. 2008) ("The Carmack Amendment generally preempts separate state-law causes of action that a shipper might pursue against a carrier

for lost or damaged goods."). If, however, CHR is determined to be a broker, Pelletron must prove its case with respect to each cause of action.

**B.     P&A's Motion for Summary Judgment**

P&A's motion for summary judgment seeks to limit its liability, based on the bill of lading, to either $10,000 or $100,000. Additionally, P&A argues that Pelletron is not entitled to special damages in this case.

Under the Carmack Amendment, the measure of damages for delayed delivery is "the difference between the market value of goods at the time of delivery, and the time when they should have been delivered." *Paper Magic Grp., Inc. v. J.B. Hunt Transp., Inc.*, 318 F.3d 458, 461 (3d Cir. 2003). The Carmack Amendment does not alter the long-standing common law rule that special, or consequential, damages are only to be awarded if "a shipper actually notified the carrier that the goods required special handling of some kind, thereby giving the carrier notice and making the damages foreseeable." *Id.*; *see also Orlick v. J.D. Carton & Sons, Inc.*, 144 F. Supp. 2d 337, 345 (D.N.J. 2001) ("[S]pecial damages are available under the Carmack Amendment if the carrier had notice of the special circumstances from which such damages would flow at the time the bill of lading contract was made.") (internal quotation marks omitted).

The intended recipient of the goods refused delivery, and Pelletron argues that it cannot use the goods given their custom nature. In addition to general damages, Pelletron also seeks damages for having to reorder the equipment on an expedited basis, additional personnel costs, re-shipping costs, and costs for delays and interruption in Pelletron's installation.

The Court agrees with P&A that Pelletron never put Defendants on notice of special damages that Pelletron might incur. The record is devoid of any prior dealings between the companies

indicating the special nature of these goods or any written or even constructive notice that the special damages sought by Pelletron were foreseeable here. Therefore, as a matter of law, Pelletron is not entitled to recover special damages here. *See Main Road Bakery, Inc. v. Consol. Freightways, Inc.*, 799 F. Supp. 26, 29 (D.N.J. 1992) (declining to grant special damages when carrier was unaware that failure to timely deliver cake would require bakery to disassemble oven or pay for replacement oven).

Pelletron places great emphasis on the "special delivery instructions" that Pelletron provided CHR, as well as the fact that Pelletron sent a sales engineer to CarbonLITE's facility to arrange for delivery appointments and to ensure that all parts of the shipment were received in good condition. (Pl.'s Facts ¶¶ 22-23, 61-62, 65.) Pelletron also points out that its representative loaded the trucks in Pennsylvania "due to the custom nature of the goods." (*Id.* ¶ 33, 70.) The Court fails to see how a fact finder could conclude that because Pelletron provided a time for CHR to deliver the goods and sent a representative to receive the goods in California, a genuine issue of material fact exists with respect to the foreseeability of special damages. It is unsurprising that Pelletron provided CHR with a date for shipment. Nor does the fact that Pelletron elected to load the truck prior to shipping the goods indicate that Defendants were on notice that failure to deliver the goods would result in special damages. The only information the Court can glean from the record regarding the special nature of the goods is a communication from the president of Pelletron informing CHR that the "stolen equipment is custom made for the Carbonlite plant and it should be installed next month. Replacement of the goods will take at least 3 months. This is a major setback for the start-up of the plant." (Pl.'s Facts ¶ 91.) Of course, this information was conveyed to CHR after the shipment left Pennsylvania and had been stolen in California. It certainly did not place CHR or P&A on notice

prior to shipping. There is no evidence in the record that at the time of shipping, Defendants were aware that failure to deliver the shipment in time would render the shipment useless to its ultimate recipient. Therefore, Pelletron is not entitled to special damages at to either Defendant.

Though the issue of special damages can be decided as a matter of law, any further limitation of liability is unwarranted at this stage. Pelletron has put forth evidence that the parties intended for its shipment to be insured for $100,000 and that a $10,000 limit was unreasonable given the circumstances surrounding the shipment. Finally, as the Carmack Amendment claims remain viable, a trial is appropriate to decide the proper method for calculating damages and whether Defendants properly limited their liability. As even P&A seems unsure whether damages should be limited to $10,000 or $100,000, summary judgment is unwarranted. The Court notes, however, that based on Pelletron's understanding that the value of the goods for insurance purposes was $100,000 and its concern that CHR had insurance coverage for up to that amount, P&A's attempt to limit liability to $10,000 appears to take advantage of a mistake. Accordingly, the Court denies summary judgment to P&A, and the parties may present evidence as to the appropriate dollar figure for damages.

### IV. CONCLUSION

Because the status of CHR cannot be decided as a matter of law, CHR's motion for summary judgment is denied. P&A's motion for summary judgment is also denied to the extent it seeks to limit P&A's liability. The Court will grant P&A's motion with respect to the issue of special damages. An Order consistent with this Memorandum will be docketed separately.